## METROPOLITAN LIFE INS. CO. v. RUSSELL.
### No. 2974.

Court of Civil Appeals of Texas. El Paso.
March 29, 1934.

Rehearing Denied May 3, 1934.

R. A. D. Morton and H. D. Stringer, both of El Paso, for appellant.

John T. Hill, of El Paso, for appellee.

HIGGINS, Justice.

This is a suit by Mary A. Russell, the surviving wife of William L. Russell, deceased, against the Metropolitan Life Insurance Company, to recover upon a policy of group life insurance issued to the Southern Pacific Company insuring the employees of said company and its subsidiaries against death and certain disabilities.

William L. Russell ceased actively working for the railroad company on June 8, 1932, and died July 14th, following.

The first issue submitted inquired whether "on the 8th day of June, 1932, when the deceased, William L. Russell, ceased active work for the Railroad Company, it was contemplated by the Railroad Company and the said Russell, that the said lay-off of Russell should not continue for a period longer than three months." This was answered "Yes."

Another issue inquired what would be a reasonable fee for plaintiff's attorney. This was fixed at $600. No other issues were submitted.

Judgment was rendered in the plaintiff's favor for the amount of Russell's coverage— $2,500. Recovery of penalty and attorney's fee was denied; the court holding the contract was governed by the law of New York and the Texas statute relating to attorney's fees and penalty had no application, to which denial the appellee cross-assigns error.

Individual certificates were issued by the insurance company to the employees entitled thereto showing the amount of coverage under the group policy.

The premiums upon the policy were payable by the employer on the first of every month. There is no provision in the policy requiring the payment of premiums by the employees. But, as a matter of fact, the employer collected monthly from each employee covered, 75 per cent. of the proper premium chargeable against such employee.

The deceased was a telegrapher station agent, but for several months prior to June 7, 1932, had worked only intermittently; the intermittent character of his service being due to falling off in business, force reduction and lack of need by the employer for constant service.

The policy provides the following as to the discontinuance of insurance when the employee ceases to be in the employ of the employer: "(a) The insurance on any Employee insured hereunder, who shall have ceased to be in the employ of the Employer, shall be discontinued as of the date such Employee terminated his employment. For the purposes of the insurance hereunder, employment is assumed to continue until the monthly due date next following the date the Employee actually left the employ of the Employer."

The policy also provides: "Lay-off or leave of absence of three (3) months or less shall not be considered, and retirement on pension shall not be considered a termination of employment within the meaning of this Policy unless notification to the contrary shall have been given by the Employer to the Company within thirty-one (31) days after the date when such lay-off, leave of absence or retirement shall have commenced."

The policy provides the following as to a conversion of the insurance when employment is terminated:

"Section 10: Conversion Privilege.—Upon termination of employment of any Employee, all his insurance hereunder shall immediately cease, in accordance with the Formula, and the said Employee shall be entitled to have issued to him by the Company, without evidence of insurability, and upon application made to the Company within thirty-one days after such termination, and upon the payment of the premium applicable to the class of risk to which he belongs and to the form and amount of the policy at his then-attained age (nearest birth-day), a policy of Life Insurance in any one of the forms customarily issued by the Company, except Term Insurance, in an amount not exceeding the amount of his protection under this Policy at the time of such termination.

"The Company shall, upon cessation of insurance hereunder of any Employee because of termination of employment, be released from any liability on account of such Employee unless and until an individual policy is issued in accordance with the provisions of this Section."

As to the monthly due date of the policy it is provided: "In Consideration of the application of the Employer for this Policy, a copy of which application is attached hereto and made a part hereof, and of the individual written applications—if any—of those Employees of Southern Pacific Company and Subsidiary Companies (herein called the Employer) who are eligible of insurance provided hereunder in accordance with the Formula hereinafter contained, and in consideration of the payment by the Employer of the premium due on the date of issue of this Policy and of the payment of the premiums due thereafter during the continuance of this Policy, on the first day of each month (herein called the due-dates), as hereinafter provided, etc."

The policy also contains a provision relating to the keeping of a register of the employees insured, reading as follows: "Section 11. Register—The Employer shall keep a Register (in card index form), which shall show at all times the names of all Employees ever insured hereunder and the amount of insurance in force or previously discontinued on each of such Employees, together with the date when any insurance became effective or was discontinued or of any increase or decrease thereof. The Employer agrees to allow the Company to audit and inspect such Register at any time."

The only question which need be considered arises upon the point made by appellant that there is no evidence to support the finding that on June 8, 1932, when the deceased ceased active work for the railroad company, it was contemplated by said company and deceased that the said lay-off of Russell should not continue for a period longer than three months, and that the court erred in overruling the defendant's motion for an instructed verdict in its favor.

From the statement which has been made, it is apparent Russell's insurance terminated July 1, 1932, because his employment had previously ceased on June 8th, unless such cessation of employment is to be considered a lay-off of three months or less, in which event, under the terms of the policy, such cessation of work is not to be considered a termination of employment.

Upon this crucial question there is no dispute in the evidence. It is shown by the testimony of the plaintiff's witnesses, Perazzo and Pattison, who alone testified upon that phase of the case.

The deceased was a telegrapher and station agent on the extra board. Under a working agreement between the railroad company and the Telegraphers' Union the telegraphers had certain seniority rights; the effect of which was that the company, in calling back to work men who had been laid off, were required to give preference to the men in the order of their seniority. Russell was No. 118 on the seniority roster, but the first 101 men on the roster had permanent jobs. There were thus, as a practical matter, but 16 men on the extra board with seniority which would delay the recall of Russell to work. Some of these 16 were not capable of doing station work, and, in case of need for a man who could do both station work and telegraphy, Russell would be given preference over a man who could telegraph but could not do other station work. Just how many of the 16 there were who could not do general station work the evidence does not show. The employees were paid twice a month. Payment for the first 15 days of the month was made on the 20th. The amount of insurance premiums due by employees was deducted from this pay check. Payment for the last half of the month was made on the 5th of the succeeding month. Russell's share of the premium for June was deducted from his pay check for the 7 days he worked in the first half of June. No payment was made by him or the railroad company for July.

The witness Perazzo was the chief clerk in

the office of the railroad superintendent, and was in charge of employment of telegraphers and agent telegraphers upon the Rio Grande division where Russell was employed. He had charge of the employment records. A telegrapher could not be discharged except for cause. Perazzo had no authority to discharge an employee "for cause," that being the province of the superintendent, but Perazzo did have the authority to terminate employment because of force reduction. That was handled by him. He also was authorized to employ.

With reference to whether the lay-off of Russell is to be considered as falling within the purview of the "lay-off clause" in the policy, Perazzo testified:

Cross-examination:

"Q. Now, I will ask you whether or not Mr. Russell's employment was terminated after the services he performed on June 6th or 7th? A. Yes, it seemed at that time, due to closing many telegraph stations and agencies, it appeared that Mr. Russell would no longer be able to work. What I mean by no longer, for perhaps a period of one or two years, and I informed him of that fact many times.

"Q. Did you transmit that information to the insurance clerk, that is, the fact that his employment had been discontinued?

"Mr. Hill: We object to that question, he did not say it was discontinued.

"The Court: Over-rule the objection.

"Q. Did you transmit that information to the insurance clerk? A. Yes, sir, I did. At the end of each month the insurance clerk approaches me and asks if a certain individual will be able to work during the following month, and the chances of that individual performing any further services so that he will be able, be in a position to either continue or cancel the insurance; that is what has occurred in this case.

"Q. Mr. Russell was not actually employed by the company after June 7th, 1932, was he? A. No, sir. * * *

"Q. Now, this seniority list. That is merely a list of the ones under your jurisdiction who have not been discharged for cause, isn't it? A. Yes, sir.

"Q. The fact of being on that seniority list does not indicate that a man is employed by the company, does it? A. No, sir.

"Q. I believe, as you say, you have men there who haven't done a lick of work in four years, on that list, haven't you? A. Yes, all of four years. I might add in there, that should we increase our forces, telegraph forc-

es, the men cut off are given an opportunity of returning to the service in seniority order.

"Q. Now, just what do you mean by that Mr. Perazzo? A. Well, we will say that the seniority roster consists of a hundred men, and there are only sixty jobs, perhaps from number sixty-one to seventy, those men are we will say hanging around hoping to get on again and the rest of them are scattered all over when business increases and we need more men we don't hire new men, but we give the older fellows, the fellows that are already on the seniority roster an opportunity of coming back if they so desire.

"Q. Then a man on that seniority list or on the extra board is under no duty when you find a job for him to come back? A. No.

"Q. In other words, as a matter of courtesy you call on him and if he wants the job he takes the job? A. It is not a matter of courtesy, it is a matter of schedule provision, the telegraphers' schedule requires that we handle it in that manner.

"Q. Now, do you mean by that the contract between the telegraphers' union and the railroads? A. And the railroads, yes, sir."

Redirect examination:

"Q. You knew his necessity for a job, didn't you? A. Very well, yes, sir.

"Q. To work—you knew that necessity? A. Yes.

"Q. And you were favorable to him, yourself personally, were you not? A. Yes, I was.

"Q. And you were looking out for him for a job at the time he was coming there to your office and inquiring about it, weren't you, you would have liked to have placed him? A. Very much, yes, sir.

"Q. And you very probably would have placed him would you not if he had stayed on and had not died?

"Mr. Morton: We object to that as being speculative, and wholly immaterial to any issue in this case.

"The Court: Go ahead and answer.

"Mr. Morton: We except.

"A. I doubt very much, under the conditions as we have had during the past two years if I would have been able to place him in any capacity. I base my answer on the fact that there are a number of other men who are cut off whom I have been trying to place with no success. * * *

"Q. You can tell now, of course, because you have had a chance to observe what has happened since Mr. Russell's death, to better determine what the prospects would be than at

the time he died, can't you? A. Yes, but I was in a pretty good position to say at that time because I knew of stations that we were contemplating on closing.

"Q. Now, when anyone—extra man wanted a job, there was a great many of them would not go or did not want to go to certain places, didn't they? A. No, an extra man when ordered to go to a station had to go.

"Q. He could refuse to go, couldn't he? A. Subject to dismissal, yes, sir.

"Q. If he did he would be dismissed. Some of them got applications to lay off didn't they, or got letters so they could go to other parts of the country? A. Yes, sir."

Recross-examination:

"Q. Mr. Perazzo, at the last time you saw Mr. Russell, you say you thought it was the latter part of June? A. As near as I can recall, seems like the latter part of June, or perhaps the first part of July.

"Q. At that time you acquainted him with the fact that you had no hope of any employment for him in July?

"Mr. Hill: We object to that because these notices that even attempt to terminate employment must be in writing.

"The Court: Over-ruled.

"A. I informed Mr. Russell upon at least two occasions and perhaps more, that the opportunity of returning to the service was very remote, in fact I even acquainted Mrs. Russell of that fact."

The witness Pattison was the insurance clerk of the railroad.

He testified that on June 7, 1932, he noted the cancellation of Russell's employment on his record as of that date.

The record was offered in evidence and bears the notation, "canc. 6–7–32." The cancellation was reported to the San Francisco main office of the railroad company; the latter office being the one that dealt with the insurance company. Russell did not pay anything to the railroad company on account of the July premium, nor did the Southern Pacific do so.

Redirect examination:

"Q. There is nothing on your record to show is there, that Mr. Russell terminated his services, or the company discharged him, is there? A. He was cut off in force reduction.

"Q. Was he—in other words was he in the employ of the company or not when he died? A. Not actively.

"Q. Well, was his services terminated? A. Not as a definite proposition.

"Q. In other words he had a right to work for the company if they could get him a job? A. If employment presented itself.

"Q. But he was temporarily suspended? A. Yes, sir.

"Q. That is they had no job for him? A. Yes.

"Q. Now, what is the reason they had no job for him? A. Forces had been reduced to the extent that there were quite a number of older men that would have preference to any job that would present itself. * * *

"Q. Do you know or not know what the probabilities were of his being put on a job soon at the time that—just prior to his death? A. They were very remote.

"Q. Very remote? A. Yes, sir.

"Q. Now, why do you say it was remote? A. Well, the so-called extra list in that class of employ are not used first in and first out as they are in train and engine men, but the oldest employee cut off has preference and next, so on down the line.

"Q. Well, it has been shown here that on the seniority list there were 118 people, employees in this division, it is shown that 102 of them were actually working, that would leave 16 that were temporarily out of a job; now, under those conditions what do you say was the probability of Mr. Russell getting work? A. Very remote indeed because the oldest man of that sixteen would have preference to any job coming up and he would take his place at the foot of the list of that 16 and of necessity the other 15 men would have to go to work before he could be used. * * *.

"Q. As a matter of fact, you being an office man and in that insurance department, you use every precaution to protect the insurance company with reference to insurance of employees? A. I use every effort to keep the insurance in force for the employee if possible.

"Q. Well now, do you act in behalf of the employees or the insurance company? A. As an employee myself I have always acted in the behalf of the employee. I had the employees interest more at heart than anyone else.

"Q. How is that? A. I had the employees interest at heart more than anything else in that connection."

The testimony of the witness Pattison further shows he had no connection with the insurance company except to receive death benefit checks and deliver the same.

The insurance was intended to cover only employees of the Southern Pacific Company and its subsidiaries. It was not intended to

660

cover individuals who had ceased to be in the employment of the company except those who were on lay-off or leave of absence of three months or less or retired on pension.

In this connection we quote from the Supreme Court of Kansas in Leach v. Metropolitan Life Ins. Co., 124 Kan. 584, 261 P. 603, 605: "It is clear that in making the arrangement now under consideration, the parties understood that the defendant was to insure employees of the railway company, and not those who had been employed and whose employment had ceased. Group life insurance differs from ordinary old-line life insurance. Group insurance is similar in many respects to workman's compensation insurance. Each is secured by the employer for the benefit of the employee. Employment is a condition precedent for each to be effective. The employer and employee stand closer together in group insurance than in workman's compensation insurance."

The testimony of the plaintiff's own witnesses, as we view it, shows conclusively that, when Russell ceased work on June 6th and was laid off, there was no reasonable probability whatever that he would be called back to work within the next three months, and that such fact was well known to Perazzo, the representative of the company in charge of employees of the class to which Russell belonged. Such being the case, it could not have been contemplated by the railroad company and Russell that the lay-off would not continue longer than three months. Russell must have known the situation and realized that there was no probability that he would be called back at any time within the next three months. But whether Russell realized it or not is immaterial. The fact remains that he was laid off, and, under the facts and circumstances shown by the evidence, it cannot be considered that it was a lay-off for three months or less or that there was any basis for a belief by the parties that the lay-off should be of such a temporary character.

Such being the case, the finding upon the first issue is unsupported by and contrary to the evidence. A peremptory instruction in defendant's favor should have been given. None of the cases cited by appellant are of any special value upon the present facts, but in support generally of our ruling see the following: Joinder v. Metropolitan Life Ins. Co., 43 Ga. App. 1, 157 S. E. 703; Beecey v. Travelers' Ins. Co., 267 Mass. 135, 166 N. E. 571; Douglas v. Metropolitan Life Ins. Co. (Mo. App.) 297 S. W. 87; Metropolitan Life Ins. Co. v. Hawkins, 156 Va. 720, 158 S. E. 877; Kowalski v. Aetna Life Ins. Co., 266 Mass. 255, 165 N. E. 476, 63 A. L. R. 1080; Thull v. Equitable Life Assur. Soc., 40 Ohio App. 486, 178 N. E. 850; Equitable Life Assur. Soc. v. Garrett, 25 Ala. App. 446, 148 So. 338; Pegues v. Equitable Life Assur. Soc. (Mo. App.) 57 S. W.(2d) 705; Peyton v. Metropolitan Life Ins. Co. (La. App.) 148 So. 721; Ætna Life Ins. Co. v. Lembright, 32 Ohio App. 10, 166 N. E. 586; Greeley v. Ætna Life Ins. Co., 150 Wash. 611, 274 P. 106; Roehrig v. Missouri State Life Ins. Co., 251 Ill. App. 434; Chrosniak v. Metropolitan Life Ins. Co., 121 Misc. 453, 201 N. Y. S. 211.

We think no importance attaches to the rights of Russell under the seniority agreement between the telegraphers' union and his employer. It merely conferred upon him the right to preferential consideration in the order of his seniority in the event his employer had occasion to recall into service any of the men upon the seniority roster. There were a number of unemployed upon the roster with seniority superior to Russell.

Reversed and rendered.